COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, O'Brien and Raphael
Argued at Lexington, Virginia

LAWRENCE MCNALLY

v.        Record No. 0816-23-3

VIRGINIA DEPARTMENT OF MOTOR VEHICLES

OPINION BY
JUDGE STUART A. RAPHAEL
MARCH 26, 2024

FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Andrew S. Baugher, Judge

J. Caleb Jones (Simms Showers, LLP, on briefs), for appellant.

Muhammad Umar, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following his for-cause termination by the Department of Motor Vehicles ("DMV"),

Lawrence McNally sought reinstatement under the State Grievance Procedure, Code §§ 2.2-3000

to 2.2-3008.  After an evidentiary hearing, the hearing officer upheld the DMV's decision,

issuing written findings of fact and conclusions of law.  On administrative review, the Director

of the Department of Human Resources Management (DHRM) found the hearing officer's

decision consistent with agency policy.  McNally appealed to the circuit court, claiming that the

hearing officer's decision was "contradictory to law."  Code § 2.2-3006(B).  McNally argued

that he was denied procedural due process because the hearing officer was biased, improperly

restricted cross-examination, and invented facts not supported by the record.  The circuit court

rejected those arguments, however, finding that McNally was attempting to challenge "factual,

procedural, and policy elements of the Hearing Officer's decision" that are not subject to judicial

review under the State Grievance Procedure.

PUBLISHED

The circuit court was right to reject McNally's appeal because the hearing officer did not violate due process. Though dressed up in the language of a constitutional violation, McNally's claims are simply repackaged versions of his arguments to the hearing officer and DHRM. McNally received fair notice of the charges against him and a fair opportunity to respond to those charges. As McNally received all the process that was due, the hearing officer's decision was not "contradictory to law." Code § 2.2-3006(B).

BACKGROUND

An appeal to the circuit court under the State Grievance Procedure is based on the "grievance record" compiled during proceedings before the agency. *See* Code § 2.2-3006(B). The circuit court, "much like an appellate court," must review the "facts developed in the agency record in the light most favorable to the party prevailing in that forum." *Va. Dep't of Alcoholic Beverage Control v. Tyson*, 63 Va. App. 417, 421 (2014) (quoting *Va. Dep't of Transp. v. Stevens*, 53 Va. App. 654, 658 (2009)). "On further appeal to us, we apply the same standard." *Id.* We therefore view the facts here in the light most favorable to DMV.

In 2020, McNally served as a Senior Special Agent in the DMV's Law Enforcement Division. He reported to Assistant Special Agent in Charge John Lamper, who in turn reported to Special Agent in Charge Dave Kyger. Kyger reported to Joseph Hill, the DMV's Assistant Commissioner of Enforcement and Compliance. Hill, in turn, reported to the Commissioner of DMV.

Agent Kyger first met McNally when McNally moved to Kyger's neighborhood in Rockingham County. McNally joined the Ruritan Club, where Kyger had been a member for 30 years. McNally had law-enforcement experience working for the United States Park Service. Kyger hired McNally as a law-enforcement officer for DMV, and the two became close friends.

*A. McNally's conduct during two incidents prompt DMV to investigate.*

The three offenses for which DMV fired McNally stemmed from two events: a March 2020 incident in which McNally totaled his cruiser after taking medication for an MRI; and an August 2021 off-duty incident in which McNally reportedly lied to the fire marshal that he was watching a controlled burn on his own property when McNally was actually at the Ruritan Club, a couple miles away.

*1. The March 2020 cruiser incident*

On March 3, 2020, McNally called Agent Lamper to report that he was having an MRI the next morning but planned to come to work afterward. Kyger was having lunch with Lamper when McNally called, and Kyger could hear McNally's voice over the phone. Kyger had worked with McNally in the same office for about ten years. Kyger knew that McNally was claustrophobic and had to take a "sedative" before undergoing an MRI. Upon hearing McNally tell Lamper that he planned to drive to work, Kyger took the phone from Lamper to speak to McNally directly. Kyger told McNally that, because "you're taking the sedative," "you cannot work that day, take the day off." McNally at first resisted: "I know how to control this." But Kyger insisted that McNally not drive while medicated. McNally "argued a little bit," but finally relented, saying "okay, all right."

In his testimony at the grievance hearing, Lamper corroborated Kyger's account of that conversation. Lamper specifically recalled Kyger's instructing McNally not to drive his car the next day after being medicated.

Yet McNally drove himself to the MRI appointment the next morning, where he took twice the prescribed dose of Lorazepam, a generic version of the Ativan he had been prescribed. After the MRI, McNally drove to work. Shortly before 6:00 p.m., while driving home in his

state cruiser, McNally veered across the center line of Route 612, struck an oncoming pickup truck, and ran off the road through a field and into a swamp. His state cruiser was "totaled."

McNally did not remember the crash; his first memory of the incident was driving through the field. McNally left a voicemail message on Kyger's phone that he had just "had a wreck." After hearing the message, Kyger jumped into his truck and drove to the scene. Emergency responders had arrived and had taken custody of McNally's knife and service weapon. Kyger testified that McNally's "speech was slurred." One of the first responders told Kyger, "I know Larry [McNally]. He ain't right, something's wrong."

On March 6, McNally confided in Lamper by telephone that he should not have been driving the cruiser after his MRI. After Lamper reported that conversation to Kyger, Kyger instructed Lamper to memorialize what McNally had said. Lamper's notes recorded McNally as having said, "I could feel the signs and I knew I should not be driving the cruiser—but I did anyway."

Kyger reported the incident to the State Police and to DMV's human resources division for further investigation. Pending that investigation, McNally was placed on paid administrative leave.

### 2. The August 2021 fire-marshal incident

In July 2021, McNally obtained a six-month "Open Burn" permit from the Rockingham County fire department to dispose of brush and landscape waste. The permit required, among other things, that the "responsible party must stay outside with the fire until it is completely extinguished. You may not leave the fire unattended or smoldering." The permit recited that a violation of its terms was a "Class 1 Misdemeanor."[1]

_____

[1] McNally testified that he did not see the terms on the permit because he did not have a copy of it.

- 4 -

McNally conducted an open burn on his property sometime during the day on August 3, 2021. It is undisputed that McNally went to the Ruritan meeting at some point before the fire was extinguished, but the testimony about *when* he left for the Ruritan meeting was in conflict. The Ruritan meeting was about two and a half miles from McNally's home. The club convened for dinner that evening at 7:00 p.m., with a business meeting that followed.

Kyger testified that he saw McNally at the meeting "somewhere around" 7:00 p.m., when McNally arrived "to eat supper." Kyger recalled "with certainty" that he saw McNally there for dinner. The DMV investigator, Kellie Powell, testified that Larry Custer, the director of the Ruritan Club, confirmed in an interview that McNally was present when the meeting started.

At 7:43 p.m., the 911 dispatcher radioed that an anonymous caller had reported seeing an unsupervised open burn near McNally's home. Stacey Wilkins, McNally's neighbor and a volunteer E.M.S. worker, heard the dispatch and called Custer, whom Wilkins knew would be at the Ruritan meeting. Wilkins told Custer about the open-burn dispatch and asked about McNally. Custer responded that McNally was there at the Ruritan Club meeting with him.

Shortly after the 7:43 p.m. dispatch, the 911 dispatcher spoke with the fire marshal, who recalled having issued an open-burn permit to McNally. The fire marshal told the dispatcher to call McNally and ask if he was burning something and if it was under control.

At 7:49 p.m., the dispatcher telephoned McNally and asked if he had his fire under control. McNally responded:

> Yeah, . . . it's just one of those smoldering things, that's it, I'm
> . . . *I'm at the house*, *I've got an eyeball on it*, *so I'm keeping an
> eye on it*, yeah . . . . I've just got some smoke coming up. On one
> or two little logs. There's no open flame, it's just smoldering, you
> know what I mean?

(Emphasis added). The dispatcher thanked McNally and said she would report that information to the fire department.

- 5 -

After hearing that report, the fire marshal asked the dispatcher to be connected with McNally by phone. McNally told the fire marshal that he was in his house, looking out his window at the burn. The fire marshal responded that, even though McNally could see the fire from his house, he needed to "either be there with it or it needs to be extinguished." McNally said he would take care of it.

Having no reason to think that McNally was being untruthful, the fire marshal cleared the incident at 7:57 p.m. Wilkins heard the fire marshal's report over the radio that McNally had "told him that he was watching the fire from his living room window."

Kyger testified that he saw McNally at the Ruritan Club speaking on his phone before 8:00 p.m. Kyger was unsure whether McNally participated in a second call. McNally seemed "agitated" and his voice was loud, making it hard to hear the club's speaker and almost prompting Kyger to walk over to tell McNally to take the call elsewhere. But before Kyger could do so, McNally ended the call, "jumped up and took off practically running to his truck." McNally "jumped in his truck and took off in plenty of haste, going . . . toward his residence." Kyger said that happened very close to when the meeting was wrapping up, around 8:00 p.m.

Wilkins testified that he called Custer a second time, asking if McNally was still at the meeting. Custer answered that McNally had just left.

When the Ruritan meeting ended, Custer asked Kyger if he knew where McNally had gone. When Kyger said he didn't know, Custer told him that he had received a call from Wilkins, who said that McNally "was burning that lot over there for his daughter . . . to build her a house." Custer relayed that Wilkins had asked if McNally was still at the Ruritan meeting. Custer told Kyger that (according to Wilkins), McNally had "just told the Fire Marshal that he was watching the fire from his living room window." Custer knew that was untrue because McNally had been at the Ruritan meeting "the whole time."

- 6 -

Agent Kyger felt duty-bound to report McNally's apparent untruthfulness. Kyger testified that it was a serious breach of duty for one law-enforcement officer to lie to another one and that such acts of deception by a law-enforcement officer must be disclosed to defense counsel in any criminal prosecution in which that officer assists.

*B. DMV issues three offense notices calling for McNally to be fired.*

On August 26, 2021, DMV gave notice to McNally of potential disciplinary action for the March 2020 cruiser incident, and DMV invited McNally to respond. McNally did so on August 30. Shortly after DMV completed its internal investigation of the August 2021 burn incident, DMV gave McNally a revised notice that included potential discipline for that incident as well. McNally responded that he could not answer the revised notice until he received certain supporting documentation.

On September 30, 2021, Assistant Commissioner Hill issued three separate offense notices to McNally, each of which called for his dismissal for violating DHRM's Standards of Conduct, Policy 1.60.[2] The first charged that McNally admitted knowing on March 4, 2020, that he should not have been driving his cruiser after he experienced an adverse reaction to medication. Doing so "recklessly damaged state property" and caused a serious accident in violation of safety rules. The second charged McNally with disobeying Agent Kyger's directive not to drive his cruiser on March 4 after taking the medication. McNally's "insubordination" resulted in a motor vehicle accident that could have killed or seriously injured McNally or someone else. The third notice charged McNally with lying to the fire department on August 3, 2021.

---

[2] After the events here, Policy 1.60 was reformatted and revised. *See* DHRM, Policy 1.60, Standards of Conduct (eff. Mar. 7, 2022), https://perma.cc/7C4T-48PA. The administrative record contains the version in effect in 2021 (last revised June 1, 2011).

*C. McNally grieves the termination notices.*

McNally filed a grievance to contest the grounds for termination. As for the March 4 crash, McNally claimed that he had always taken two one-milligram pills of Ativan or Lorazepam before his previous MRIs, and he did not realize that the prescription this time called for two *two*-milligram pills. So he "unknowingly took twice the dosage." He denied speaking to either Lamper or Kyger by phone on March 3, 2020. He denied telling Lamper a few days later that he knew he should not have been driving but did so anyway. McNally also denied that Kyger knew about McNally's use of medication for MRI-related claustrophobia. He denied that Kyger had ordered him to refrain from driving after taking such medication. McNally asserted that both Kyger and Lamper had submitted "false statements" about the incident. McNally denied that he had lied to the fire marshal during the August 2021 incident, insisting he was "completely innocent" and had "always told the truth to everyone." McNally sought the removal of the written notices from his record, reinstatement, back pay, restoration of benefits, and attorney fees.

*D. The hearing officer conducts a formal grievance hearing.*

The Director of DHRM appointed John V. Robinson as the hearing officer. Under the hearing officer's amended scheduling order, the parties were afforded four hours' time each to present direct and rebuttal examination of that side's witnesses and to cross-examine the other side's witnesses. The parties had to pre-designate the witnesses they planned to call and the exhibits they intended to introduce. The order provided for opening statements and closing arguments.

At the grievance hearing, DMV presented live testimony from seven witnesses, including Hill, Kyger, Lamper, Powell, and the fire marshal. McNally took far more time cross-examining Hill, Kyger, and Lamper than DMV spent in their direct examination. McNally presented live

testimony from his wife, his daughter, and himself. The transcript of the one-day hearing spans 586 pages.

McNally introduced affidavits from his wife and daughter in which they claimed to have observed McNally at home on August 3, 2021, when he told the 911 dispatcher by phone that he could see the fire from the house. Both affidavits said that McNally then left to go to the Ruritan meeting. Both family members also testified by phone. For his part, McNally testified that he was home when he received the 911 call at 7:49 p.m., that he then left for the Ruritan meeting, where he spoke with the fire marshal, and that he then returned home after the fire marshal said he needed to be physically present at the open burn. McNally disputed the fire marshal's account that McNally told him he was home at the time of that call. McNally said that Agents Lamper and Kyger were both liars. He also questioned the statements attributed to Custer. McNally said that he and Custer had had some "personal disagreements" that caused Custer not to speak with him unless McNally initiated the conversation.

Investigator Powell testified that the assertions by McNally's wife and daughter—who claimed that McNally was with them at the house for the 911-dispatcher call—conflicted with the facts revealed by her investigation. Powell found that McNally engaged in off-duty misconduct by his dishonesty in his communications with the fire marshal.

Bill Anderson, a DMV employee-relations analyst, testified that termination of McNally's employment was warranted because McNally was a law-enforcement officer whose ability to testify in active cases was compromised by his dishonesty. Anderson explained:

> Because [McNally's] a police officer, . . . it's imperative . . . that he must be able to testify. And the problem is when we have evidence that a police officer has been just dishonest, has not been truthful, whether on duty or off, it makes no difference, we are required to notify prosecutors of the case is that he's handling that we have a police officer who has in the past been less than truthful. And it basically, it basically means that our police officer, because he can no longer testify, can no longer serve us as an employee.

Agent Kyger testified, as well, that McNally's misconduct had caused him to distrust McNally as a law-enforcement officer.

### E. The hearing officer upholds McNally's termination.

The hearing officer issued a 20-page ruling upholding McNally's termination "as warranted by the facts and consistent with law and policy." The hearing officer found that the testimony of DMV's witnesses "was both credible and consistent on the material issues . . . . The demeanor of such [DMV] witnesses at the hearing was candid and forthright." As for the March 2020 cruiser incident, the hearing officer found that McNally took "two sedatives at one time at 8:15 am," contrary to the prescription, which called for one tablet by mouth twice daily. The prescription instructed McNally to "get medical help right away if you feel very sleepy or dizzy," and to "[a]void driving . . . until you see how this drug affects you." Although McNally thought he was familiar with the drug, the prescription warned, "'If you are 65 or older, use this drug with care. You could have more side effects.' It state[d] 'very bad dizziness or passing out' as possible side effects." McNally was 68 at the time.

The hearing officer found that McNally "recklessly got into his state cruiser to drive the approximately 1.25 hours home," and then "recklessly drove his vehicle across the median line, hitting an innocent citizen." The hearing officer credited Agent Lamper's testimony that McNally admitted that he "knew [he] should not be driving the cruiser—but [he] did anyways" and that McNally "knew better." The hearing officer thus rejected McNally's contrary claim (and sworn testimony) that he had never said those words to Lamper.

The hearing officer also credited Agent Kyger's testimony, corroborated by Agent Lamper, that Kyger instructed McNally on March 3 not to drive to work the next day "because of the medication [McNally] would be taking for his MRI." The hearing officer thus rejected McNally's contrary testimony that no such conversation took place. The hearing officer

specifically found that McNally "did not follow [Agent's Kyger's] instructions," which "result[ed] in the crash."

The hearing officer also found that DMV acted properly in terminating McNally's employment because of the August 3 fire-marshal incident. The hearing officer concluded that McNally "misrepresented to the Fire Marshal[] that he was at home, . . . looking out his window at the fire," when in fact, McNally was "miles away at the Ruritan Club."

In sum, the hearing officer concluded that DMV had shown by a preponderance of evidence that McNally's termination was "warranted and appropriate under DHRM's Standards of Conduct." He found that McNally's "recklessness, failure to accept any measure of accountability . . . and to recognize responsibility for his shortcomings has essentially undermined his position . . . and the trust and confidence that DMV has a right to expect from every employee, especially those who are in law enforcement positions."

*F. DHRM finds the hearing officer's decision in compliance with policy.*

McNally sought administrative review from the Director of DHRM as to "whether the hearing decision is consistent with policy." Code § 2.2-3006(A). As policy objections, McNally raised (among many other arguments) the same arguments he raises here as due-process violations: that "the hearing officer 'manufactured facts which were not presented as evidence,' 'did not allow witnesses to be cross-examined' . . . and 'displayed overt bias in his questions and in his decisions.'" In a decision spanning 22 pages, the Director considered and rejected each of McNally's claims.

*G. The circuit court affirms the hearing officer's decision.*

McNally noted a timely appeal to the circuit court, contending that the hearing officer's decision was "contradictory to law" under Code § 2.2-3006(B). The circuit court received briefs from the parties and entertained oral argument.

- 11 -

The court rejected McNally's due-process claims: "Although Appellant invokes 'due process,' his arguments pertain to factual findings and procedural matters, in particular credibility of witnesses and the sufficiency of the evidence against him, rather than errors of law." McNally "couched" his argument in language of "due process," but it really amounted to "an objection to factual findings concerning witness credibility and the weight and sufficiency of the evidence," rulings that were "binding" on the court and "not subject to its review."

McNally noted a timely appeal to this Court. *See* Code § 17.1-405(A)(1)(ii).

ANALYSIS

McNally argues in Assignment of Error 1 that the circuit court erred by treating his various due-process arguments (Assignments of Error 2-5) as "outside the scope" of judicial review. McNally says that the circuit court rejected his due-process claims because the court thought that they overlapped with his argument to DHRM that the hearing officer failed to follow the correct policies under the State Grievance Procedure.

We agree in principle with McNally that a hearing officer's violation of a grievant's constitutional right to due process is subject to judicial review under the State Grievance Procedure. But we read the circuit court's opinion as concluding that McNally failed to prove a due-process violation. Indeed, the circuit court found that McNally "received notice and ample opportunity to present his case, including through cross-examination." So while McNally had "alleged due process violations, the substance of his claims" was nothing more than challenges to the "factual, procedural, and policy elements of the Hearing Officer's decision." On de novo review, we find that the circuit court got that exactly right.

> A. *A procedural-due-process claim is justiciable under the "contradictory to law" standard of the State Grievance Procedure.*

"Unless exempted by law, all nonprobationary state employees" are "covered" by the State Grievance Procedure and by "any regulations adopted" to implement it. Code

- 12 -

§ 2.2-3001(A). "[G]rievances involving dismissals due to formal discipline or unsatisfactory job performance," as in McNally's case, "proceed directly to a formal hearing." Code § 2.2-3003(A).

"The Director of [DHRM] . . . assign[s] a hearing officer to conduct the grievance hearing." Code § 2.2-3005(B). Hearing officers are directed to (among other things) "[r]eceive probative evidence; exclude irrelevant, immaterial, insubstantial, privileged, or repetitive proofs, rebuttals, or cross-examinations; rule upon offers of proof; and oversee a verbatim recording of the evidence." Code § 2.2-3005(C)(5). Hearing officers are also empowered to "order appropriate remedies," which may include "reinstatement to the same position, or if the position is filled, to an equivalent position." Code § 2.2-3005.1(A). A hearing officer's decision must "be in writing" and "contain findings of fact as to the material issues in the case and the basis for those findings." Code § 2.2-3005.1(C)(i), (ii).

A hearing officer's decision is "final and binding if consistent with law and policy." Code § 2.2-3005.1(C)(iii). The terms "law" and "policy" are terms of art. Questions of policy consistency are addressed exclusively by the Director of DHRM. Upon the request of a party for "administrative review of the hearing decision," the Director determines "whether the hearing decision is consistent with policy." Code § 2.2-3006(A).

Consistency with *policy* is different from consistency with *law*. The term *policy* means an agency's internal guidelines or rules. An internal guideline or rule is not a "constitutional provision," "statute," or "judicial decision." Nor is it a "regulation," which must be "found in the Virginia Administrative Code." *Burke v. Catawba Hosp.*, 59 Va. App. 828, 835 (2012).

A determination by the Director of DHRM on policy consistency is final and nonjusticiable. As the State Grievance Procedure makes clear, "Management reserves the *exclusive* right to manage the affairs and operations of state government." Code § 2.2-3004(B)

(emphasis added). So "whether the hearing officer's decision [is] consistent with policy is definitively not subject to judicial review." *Va. Dep't of Corrs. v. Bishop*, 75 Va. App. 1, 10 (2022). That is why we have repeatedly held that we cannot review a claim under the State Grievance Procedure that a hearing officer misapplied "policy." *E.g.*, *Murphy v. Va. Dep't of State Police*, 68 Va. App. 716, 722 (2018) (rejecting claim based on misapplication of DHRM's "Grievance Procedure Manual"); *Passaro v. Va. Dep't of State Police*, 67 Va. App. 357, 367 (2017) (rejecting claim based on misapplication of agency's "General Order"); *Stevens*, 53 Va. App. at 663 (rejecting claim based on agency's "Standards of Conduct").

In other words, "the 'tripartite review'" under the State Grievance Procedure "makes the hearing officer the finder of fact and final authority on factfinding," *Bishop*, 75 Va. App. at 3,[3] while "the Director of [DHRM] is to determine whether the hearing officer's decision is consistent with policy," *Va. Dep't of State Police v. Barton*, 39 Va. App. 439, 445 (2002). "[N]either of th[o]se determinations is subject to judicial review . . . ." *Id.* But "[w]ithin 30 days of a [hearing officer's] final decision, a party may appeal [to the circuit court] on the grounds that the determination is contradictory to law." Code § 2.2-3006(B). That is a "'very narrow' standard of review." *Andrews v. Richmond Redev. & Hous. Auth.*, 292 Va. 79, 89 (2016) (per curiam) (quoting *Va. Polytechnic Inst. & State Univ. v. Quesenberry*, 277 Va. 420, 429 (2009)).

The phrase "contradictory to law" is *sui generis*, a term of art appearing only once in the Code of Virginia. *See Barton*, 39 Va. App. at 445 ("the first and only appearance . . . as a

---

[3] The finality of the hearing officer's factual findings contrasts with the reviewability of a hearing officer's or agency's factual findings under the Virginia Administrative Process Act. *See Commonwealth v. Needham*, 55 Va. App. 316, 326 (2009). The Administrative Process Act uses a "substantial evidence" standard for the review of facts. *See* Code § 2.2-4027 ("When the decision on review is to be made on the agency record, the duty of the court with respect to issues of fact shall be to determine whether there was *substantial evidence* in the agency record to support the agency decision." (emphasis added)). By contrast, it is error under the State Grievance Procedure for a circuit court to use the substantial-evidence test to question the hearing officer's factual findings. *See Needham*, 55 Va. App. at 319-20, 324-26.

- 14 -

standard of appellate review"). *Law* in this context means a "constitutional provision, statute, regulation or judicial decision which the [hearing officer's] decision contradicted." *Quesenberry*, 277 Va. at 429 (quoting *Tatum v. Va. Dep't of Agric. & Consumer Servs.*, 41 Va. App. 110, 122 (2003)). Accordingly, a constitutional claim that a grievance proceeding was conducted in a manner that violated the grievant's procedural-due-process rights is subject to judicial review under the "contradictory to law" standard in Code § 2.2-3006(B). *See, e.g.*, *Tyson*, 63 Va. App. at 423-28 (considering but ultimately rejecting a claim that "the agency violated Tyson's procedural due process rights").

Still, it is "incumbent upon the party appealing the hearing officer's decision to specify how that decision is 'contradictory' to law and what 'law' is thereby being contradicted." *Barton*, 39 Va. App. at 445-46. "Questions regarding whether a decision is contradictory to law, including the meaning of any underlying statutes, are reviewed de novo." *Osburn v. Va. Dep't of Alcoholic Beverage Control*, 295 Va. 10, 17 (2018).

*B. The standard for determining what process is due is well established.*

The Fourteenth Amendment of the United States Constitution provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Virginia's Due Process Clause uses nearly identical language. *See* Va. Const. art. I, § 11 ("[N]o person shall be deprived of his life, liberty, or property without due process of law."). We do not automatically treat every provision of the Virginia Constitution as co-extensive with a parallel provision in the United States Constitution. *See Vlaming v. W. Point Sch. Bd.*, ___ Va. ___, ___ (Dec. 14, 2023). Virginia appellate courts, however, have generally applied the same analysis to procedural-due-process claims under both constitutions. *See, e.g.*, *Bragg Hill Corp. v. City of Fredericksburg*, 297 Va. 566, 585 (2019); *Klimko v. Va. Emp. Comm'n*, 216 Va. 750, 753 (1976); *KSS One, LLC v. Henrico Cnty.*, 76 Va. App. 770, 782

- 15 -

(2023).  As our Supreme Court has said, "Procedural due process 'protections afforded under the Constitution of Virginia are coextensive with those of the federal constitution,' and thus, '[t]he corresponding provisions of the Virginia Constitution go no further than their federal counterparts.'" *Fairfax Cnty. Sch. Bd. v. S.C.*, 297 Va. 363, 375 n.7 (2019) (alteration in original) (first quoting *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005); and then quoting *Lilly v. Commonwealth*, 50 Va. App. 173, 184 (2007)).[4]

"The legal analysis under both provisions 'involves a two-step inquiry when the government is alleged to have taken property: (1) "whether the interest *is a property interest* protected by procedural due process guarantees," and (2) "whether the procedures prescribed or applied are sufficient to satisfy the due process 'fairness' standard."'" *KSS One*, 76 Va. App. at 782 (quoting *Bragg Hill Corp.*, 297 Va. at 585).

At the first step of this inquiry, DMV does not dispute that McNally had an interest in continued employment that amounts to a valid property interest entitling him to due process before being fired.  "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  The government "may elect not to confer a property interest in [public] employment." *Id.* at 541.  When "employment is at will, 'the government may terminate the employee without being constrained by the requirements of procedural due process.'" *Morris v. George Mason Univ.*, 74 Va. App. 531, 542 n.2 (2022)

---

[4] In its most recent pronouncement, our Supreme Court said "that the protections of Article I, Section 11 are *at least as strong* as the existing understanding of procedural due-process rights secured by the United States Constitution." *Vlaming*, ___ Va. at ___ (emphasis added).  As McNally does not argue that *Vlaming* portends a departure from prior precedent, we assume that the standard remains the same under both constitutions for evaluating procedural-due-process claims.

- 16 -

(quoting *Va. Dep't of Corrs. v. Compton*, 47 Va. App. 202, 220 (2005)).  But the government may choose instead to give public employees an entitlement to continued employment, thereby creating a constitutionally protected property interest.  *See, e.g.*, *Loudermill*, 470 U.S. at 538-39; *Compton*, 47 Va. App. at 220 n.9.  Once the government does so, "it may not constitutionally authorize the deprivation of such an interest . . . without appropriate procedural safeguards." *Loudermill*, 470 U.S. at 541.

Because DMV "does not contest that the appellant had a protected property interest in his continued employment," *Morris*, 74 Va. App. at 542 n.2; *Vlaming*, ___ Va. at ___ n.38 (same), we proceed to the second step of the procedural-due-process inquiry.  The question at that step is whether the procedures at issue satisfied the "due process 'fairness' standard." *Bragg Hill Corp.*, 297 Va. at 585 (quoting *Klimko*, 216 Va. at 754).

"The answer to that question is not to be found in [a State's] statute," but in the due-process standard itself.  *Loudermill*, 470 U.S. at 541.[5]  "The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'"  *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (alteration in original) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)).  "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances."  *Harvey v. Commonwealth*, 297 Va. 403, 417 (2019) (alteration in original) (quoting *McGrath*, 341 U.S. at 162 (Frankfurter, J., concurring)).  "Rather, it is 'flexible and calls for such procedural protections as the particular situation demands.'"  *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

---

[5] A State is free, of course, to confer *greater* procedural protection than is required by "the minimum constitutionally required."  *KSS One*, 76 Va. App. at 785 n.7.

"Due process protects 'the opportunity to be heard' by requiring, at a minimum, '*some kind of notice*' and '*some* kind of hearing.'" *S.C.*, 297 Va. at 376 (quoting *Goss v. Lopez*, 419 U.S. 565, 579 (1975)). While due process aims to provide a fair hearing, it "has never been construed to require that the procedures used . . . be so comprehensive as to preclude any possibility of error." *Mackey v. Montrym*, 443 U.S. 1, 13 (1979). The Supreme Court has cautioned that "the marginal gains from affording an additional procedural safeguard often may be outweighed by the societal cost of providing such a safeguard." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320-21 (1985).

Courts typically determine whether a particular procedural protection is constitutionally required by considering and balancing the three factors set forth in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335; *see also Gilbert v. Homar*, 520 U.S. 924, 931-32 (1997) (same); *Harvey*, 297 Va. at 417 (same); *Jackson v. W.*, 14 Va. App. 391, 411-12 (1992) (same).

Sometimes, "due process requires more" procedural protections. *Harvey*, 297 Va. at 417. "For example, an indigent criminal defendant facing incarceration is entitled to court appointed counsel." *Id.* But sometimes it requires less. "In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse *administrative* action." *Loudermill*, 470 U.S. at 545 (emphasis added) (quoting *Mathews*, 424 U.S. at 343).

The State Grievance Procedure in Virginia entitles a State employee to extensive procedural safeguards, including an evidentiary hearing before a neutral hearing officer. *See* Code § 2.2-3005(B), (C). We have repeatedly said "that '[t]he "elaborate statutory grievance

procedures" required by the State Grievance Procedure "more than satisfy the minimal requirements of due process."'" *Taylor v. Va. Alcoholic Beverage Control Auth.*, 70 Va. App. 237, 263-64 (2019) (quoting *Tyson*, 63 Va. App. at 423-24).

### C. *McNally failed to show a constitutionally deficient procedure.*

McNally does not dispute that the State grievance procedures, on their face, satisfy due process. Instead, he brings what he calls an "'as applied' due process challenge," arguing that those "grievance procedures [we]re not followed . . . to such an extent that it constitutes a violation of basic due process." McNally Br. 2. McNally argues that the hearing officer denied him procedural due process in three respects: by relying on "hearsay within hearsay" of Larry Custer, an absent witness; by limiting the duration of McNally's cross-examination of Agent Kyger; and by allegedly inventing facts that were not supported by the record. (Assignments of Error 3-5.)[6]

McNally did not argue to the hearing officer that these aspects of the proceeding violated McNally's right to procedural due process. But our appellate courts have not yet decided whether the contemporaneous-objection requirement applies in proceedings before a hearing officer under the State Grievance Procedure. Nor has the DMV argued for a procedural default

---

[6] We reject the suggestion that *any* violation of State law or misapplication of the State Grievance Procedure violates due process. The Supreme Court of the United States has "long recognized that a 'mere error of state law' is not a denial of due process. If the contrary were true, then 'every erroneous decision by a state court on state law would come [to the Supreme Court] as a federal constitutional question.'" *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (quoting *Gryger v. Burke*, 334 U.S. 728, 731 (1948)). Likewise, the violation of a State policy or regulation does not automatically violate due process. "When the minimal due process requirements of notice and hearing have been met, a claim that an agency's policies or regulations have not been adhered to does not sustain an action for redress of procedural due process violations." *Stevens*, 53 Va. App. at 665 (quoting *Goodrich v. Newport News Sch. Bd.*, 743 F.2d 225, 227 (4th Cir. 1984)).

- 19 -

here.  We therefore assume without deciding that McNally's due-process claims are preserved for review and are not defaulted.[7]

Whether a claimant's due process rights were violated by the admission of evidence or by the conduct of the proceedings presents a question of law that we review de novo.  *E.g.*, *Henderson v. Commonwealth*, 285 Va. 318, 329 (2013); *Brown v. Commonwealth*, 74 Va. App. 721, 736 (2022).  But in answering that question, we "accept[] the historical facts."  *Henderson*, 285 Va. at 329.  And "[f]or reasons analogous to those governing appellate review" in other contexts, we view the evidence at the grievance hearing here "in the light most favorable to . . . the prevailing party, including all reasonable and legitimate inferences that may properly be drawn from it."  *Id.*

---

[7] Whether the contemporaneous-objection requirement applies here "is an important question of first impression in Virginia that should be decided only after full briefing." *Moncrieffe v. Deno*, 76 Va. App. 488, 503 (2023).  Our appellate courts have regularly held in other administrative-appeal contexts, including under the Administrative Process Act, that "[a] party in an administrative proceeding must make a specific, contemporaneous objection to a ruling in that proceeding in order to challenge the ruling on appeal."  *Va. Bd. of Med. v. Hagmann*, 67 Va. App. 488, 513 (2017); *see also Verizon Online LLC v. Horbal*, 293 Va. 176, 187 (2017) ("Similar to appeals from agency decisions under the VAPA, principles of procedural default, such as those protected by Rules 5:25 and 5A:18, apply to determinations of the Tax Commissioner judicially challenged . . . ."); *New Age Care, LLC v. Juran*, 71 Va. App. 407, 430 (2020) ("Principles of procedural default, analogous to those governed by Rule 5A:18, apply to agency decisions judicially challenged on appeal." (quoting *French v. Va. Marine Res. Comm'n*, 64 Va. App. 226, 232 n.2 (2015)); *Va. Ret. Sys. v. Blair*, 64 Va. App. 756, 773 (2015) ("A failure of a party to raise an issue in the proceedings before the agency prohibits him from raising the issue on appeal." (collecting cases)).

But *Commonwealth Department of Corrections v. Garrett*, Nos. 0456-21-2, 0796-21-2, 2022 Va. App. LEXIS 57 (Mar. 8, 2022)—a nonprecedential ruling under Rule 5A:1(f)— suggested that a grievant might not be required to raise legal arguments before the hearing officer to argue them to the circuit court, provided the grievant established an adequate record for the issue to be adjudicated.  *Id.*, slip op. at 8 & n.4, 2022 Va. App. LEXIS 57, at *11-12 & n.4. The panel there said that its disposition would "not preclude an appealing party from raising a constitutional provision for the first time on appeal."  *Id.*

Because the parties have not briefed the issue, however, we reserve this important question for another day.

*1. The hearing officer did not violate due process by relying on hearsay attributed to Custer (Assignment of Error 3).*

McNally asserts that Custer was a critical but absent witness concerning the August 2021 fire-marshal incident. He says that Custer was the only "witness who could speak to the location of McNally at the relevant" time. McNally claims that it violated his procedural-due-process rights to deny him an opportunity to confront and cross-examine Custer, and for the hearing officer to rely on Custer's statements, which amounted to "hearsay within hearsay."

We conclude on de novo review that McNally has overstated the facts and failed to articulate a due-process violation. To begin, the finding that McNally lied to the 911 dispatcher and to the fire marshal was based on more than Custer's statements. The audio recording of the dispatcher's call to McNally had a 7:49 p.m. timestamp. But Agent Kyger testified that he first saw McNally at the Ruritan Club around 7:00 p.m., when McNally arrived for dinner. Kyger then saw McNally talking on his phone when the business meeting was underway, before 8:00 p.m., and before McNally suddenly dashed out to his vehicle to leave. Taken in the light most favorable to DMV, Kyger's testimony alone sufficed for a reasonable factfinder to infer that McNally lied when he told the dispatcher and the fire marshal that he was watching the open burn from his house.

Kyger's account was also corroborated by Wilkins. Wilkins testified that, after he heard about the unattended burn in the initial 911 dispatch—which had a timestamp of 7:43 p.m.—Wilkins called Custer at the Ruritan Club. Wilkins said that Custer confirmed that McNally was there, not at home, as McNally had told the dispatcher. *Cf.* Va. R. Evid. 2:803(1) (permitting as an exception to the hearsay rule a declarant's "present sense impression," that is, "[a] spontaneous statement describing or explaining an event or condition made contemporaneously with, or while, the declarant was perceiving the event or condition").

That is not all.  DMV's investigatory report—DMV Exhibit 22—included the substance of Custer's statement and was received into evidence at the grievance hearing without objection.  That report recounted Investigator Powell's interview of Custer.  Custer's statement to Powell tracked with Kyger's and Wilkins's testimony at the hearing.  Custer's statement was also reproduced verbatim in the written notice of offense and admitted into evidence without objection.  When Investigator Powell testified at the grievance hearing about her conversation with Custer, McNally had a full opportunity to cross-examine her about those statements.

"[P]rocedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood."  *Willner v. Comm. on Character & Fitness*, 373 U.S. 96, 103 (1963) (citing *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959)); *see Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.").  As our Supreme Court put it forty years ago, "When a governmental proceeding, whether criminal or civil in nature, threatens injury to a person or his property, the Due Process Clause subsumes the Sixth Amendment guarantees."  *Heacock v. Commonwealth*, 228 Va. 235, 241 (1984).  That "package of due-process rights" generally includes "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)."  *Id.*

But it is not as if one side here called a witness whom the other side was barred from cross-examining.  *Cf. Food Lion, Inc. v. Cox*, 257 Va. 449, 450-51 (1999) (finding reversible error in trial court's ruling prohibiting cross-examination in civil trial); *Basham v. Terry*, 199 Va. 817, 824 (1958) (same); *Campbell v. Campbell*, 49 Va. App. 498, 505 (2007) (same).  Custer never appeared as a witness at the hearing.  The question is not whether McNally was denied

cross-examination, but whether the hearing officer violated McNally's due-process rights by admitting and relying on Custer's statements made outside the hearing.

We find no constitutional error. Despite that the written notice for the August 2021 offense relied on Custer's statements, McNally did not list Custer as a witness; he merely reserved the right to call any witness listed by DMV.[8] And though DMV listed Custer as a witness, McNally objected. McNally argued that "Custer's testimony will be redundant, and *his relevant statement is already in the Written Notice*." (Emphasis added.) McNally noted his reluctance to call Custer without deposing him first.[9] McNally worried that his relationship with Custer was "complicated" by a land dispute. McNally said that "because everything [Custer] says will be heard for the first time at the hearing, we especially object to his testimony." Custer's testimony was unnecessary in any event, McNally added, because "[a]ll the relevant information is already in the documentation."[10]

This case thus bears no resemblance to *Greene*, 360 U.S. at 474, on which McNally relies. The federal government there revoked Greene's security clearance—harming Greene in his profession—based on allegations that Greene "had associated with Communists, visited

---

[8] *See* Code § 2.2-3005(C)(3) (empowering hearing officer to "[i]ssue orders requiring testimony"). Although a "hearing officer's authority to order discovery . . . is more limited than that of a court," a hearing officer may "issue an order for witnesses." DHRM, *Rules for Conducting Grievance Hearings* III(E) (July 2020), https://perma.cc/9VY7-3Q6S. Hearing officers, however, "do not have subpoena power." *Id.*, V(B). A hearing officer "may draw adverse factual inferences against a party, if that party, without just cause, . . . has failed to make available relevant witnesses as the hearing officer or EDR had ordered, or against an agency that has failed to instruct material agency employee witnesses to participate in the hearing process." *Id.*

[9] *See Rules for Conducting Grievance Hearings*, *supra*, subsection III(E) (noting that "the grievance procedure does not require, and hearing officers may not order (without both parties' agreement) discovery by . . . witness deposition").

[10] Although the hearing officer issued an order for Custer's testimony, Custer did not appear. When asked if he knew why, Agent Kyger said that Custer was "intimidated and scared" of McNally and that Custer did not "want any further problems with" him.

- 23 -

officials of the Russian Embassy, and attended a dinner given by an allegedly Communist Front organization." *Id.* at 478. The board that revoked Green's clearance "relied on confidential reports" that were "never made available to" Greene. *Id.* at 479. Although Greene was given an administrative hearing, "[t]he Government presented no witnesses," and Greene had "no opportunity to confront and question persons whose statements reflected adversely on him or to confront the government investigators who took their statements." *Id.* By contrast, McNally knew the names of DMV's witnesses and the substance of their expected testimony. He elected not to call Custer, arguing that Custer's appearance was unnecessary because his statement was already in the record. In any event, McNally cross-examined Kyger, Wilkins, and Powell about Custer's statements to each of them.

Hearsay is generally allowed in administrative proceedings, "even though inadmissible under rules of evidence applicable to court procedure." *Richardson v. Perales*, 402 U.S. 389, 410 (1971); *Groome Transp. v. Va. Dep't of Motor Vehicles*, 27 Va. App. 682, 689 (1998) ("Hearsay evidence is admissible in APA hearings . . . ."). *See also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 178 (D.C. Cir. 2013) ("[T]here is no absolute bar against the admission of hearsay evidence in agency proceedings. To the contrary, 'it is well-settled not only that hearsay can be considered by an administrative agency but that it can constitute substantial evidence.'" (quoting *Echostar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002))). The administrative rules make hearsay "admissible, provided it is otherwise reliable." Office of Executive Secretary of the Supreme Court of Virginia, *Hearing Officer Deskbook: A Reference for Virginia Hearing Officers* V(C), at 12 (rev. Dec. 2023), https://perma.cc/V6TV-RN67. "The probative weight of hearsay evidence is left to the hearing officer's discretion." *Id.*

Here, the statements attributed to Custer were not only corroborated by three witnesses (Kyger, Wilkins, and Powell); they were memorialized in Powell's investigative report. Because the hearing officer could properly find such hearsay to be reliable, he did not violate due process by crediting those statements. That is particularly so given McNally's earlier concession that Custer's live testimony was unnecessary because it was already part of the administrative record.

### 2. *The hearing officer did not violate due process by excusing Kyger from further examination (Assignment of Error 4).*

McNally complains that he was denied due process when he could not finish cross-examining Agent Kyger, who had to leave the hearing at 2:00 p.m. We are not persuaded.

Kyger was called to testify as DMV's second witness. Kyger had retired from DMV, so he appeared voluntarily and could not be compelled to attend. *See* note 8 *supra*. Kyger's direct examination spanned 43 transcript pages. McNally's cross-examination took substantially longer, spanning another 58 pages. Seven pages into that 58-page cross-examination, Kyger told the hearing officer that he had to leave by no later than 2:00 p.m. When McNally's counsel said he expected to finish with Kyger by then, the hearing officer announced that Kyger "definitely" could leave by 2:00 p.m.

Thirty transcript pages later—at about 1:50 p.m.—McNally's counsel was reminded that Kyger had to leave at 2:00 p.m. DMV offered that Kyger could be available by telephone that afternoon, but that Kyger would be in a car. When McNally said he needed to show Kyger documents, the hearing officer suggested that McNally use the remaining time to question him, and McNally did so. Shortly after 2:00 p.m., Kyger had to leave, but he agreed to be available later by phone if needed.

Nearing 6:00 p.m.—about 216-transcript pages later, and after 7 other witnesses had testified—McNally's counsel was reminded that he needed to call Kyger if he wanted to finish the cross-examination. McNally's lawyer said he preferred to take McNally next. The hearing

- 25 -

officer suggested he first complete Kyger's examination. But McNally's counsel refused. He also refused to release Kyger as a witness.

Noting that McNally had not requested an order for Kyger's attendance, the hearing officer excused Kyger from further testimony. McNally's counsel objected, stating "if I had been able to complete my cross examination of Mr. Kyger, there was a part of the burn permit issue that could have saved a lot of time with other witnesses who we had to get that from."[11]

We find no due-process violation for the hearing officer to have excused Kyger from further examination. To be sure, "[o]ne of the most zealously guarded rights in the administration of justice is that of cross-examining an adversary's witnesses." *Moore v. Commonwealth*, 202 Va. 667, 669 (1961). Our courts have "recognized a fundamental right to cross-examination on a matter relevant to the litigation," a right that "applies in civil cases." *Campbell*, 49 Va. App. at 504 (citing *Velocity Express Mid-Atlantic, Inc. v. Hugen*, 266 Va. 188, 204-05 (2003)). "[R]igorous cross-examination" may be "'the greatest legal engine ever invented for the discovery of truth.'" *Dennis v. Commonwealth*, 297 Va. 104, 126 (2019) (quoting 5 John Henry Wigmore, *Wigmore on Evidence* § 1637, at 29 (3d ed. 1940)).

---

[11] Our appellate precedent requires a party challenging the limitation of cross-examination to proffer what the excluded testimony would have shown. *See, e.g.*, *Whittaker v. Commonwealth*, 217 Va. 966, 968 (1977) ("[W]hen testimony is rejected before it is delivered, an appellate court has no basis for adjudication unless the record reflects a proper proffer."); *Castillo v. Commonwealth*, 70 Va. App. 394, 461 (2019) ("When a trial court limits a defendant's cross-examination, the accused must proffer the excluded testimony for the record on appeal."); *Stewart v. Commonwealth*, 10 Va. App. 563, 568 (1990) (same); 1 Kent Sinclair, *The Law of Evidence in Virginia* § 11-8, at 646 & n.178 (8th ed. 2018) (same; collecting cases). Without citing that line of authority, however, we said in *Campbell* that a party denied *any* cross-examination of a witness was not required to proffer what the "anticipated testimony on cross-examination" would have shown. 49 Va. App. at 505-06. Our assumption here that McNally satisfied the proffer requirement, and the fact that McNally was not denied all cross-examination of Kyger, makes it unnecessary to decide whether *Campbell* conflicts with the proffer requirement or creates an exception to it in cases where all cross-examination is disallowed.

But once "the right of cross-examination has been substantially and fairly exercised," "the allowance of further cross-examination becomes discretionary with the court." *Moore*, 202 Va. at 669; *see also, e.g.*, *Fields v. Commonwealth*, 2 Va. App. 300, 308 (1986) (same). Indeed, cross-examination must sometimes be reined in. More than a century ago, our Supreme Court recognized the "notorious fact that in many cases much time is unnecessarily consumed by aimless, useless and prolonged cross-examinations, so that unless the discretion of the trial courts to limit counsel is firmly maintained, the evil which is already serious will be magnified." *Norfolk S. R.R. Co. v. Fentress*, 127 Va. 87, 92 (1920). "The admission or rejection of such evidence is not controlled by any inflexible rule, but by a sound though undefined judicial discretion, depending upon the circumstances of the particular case, and subject to review." *Id.*

Because McNally enjoyed a fair opportunity to cross-examine Kyger, any due-process concern was satisfied. Kyger's cross-examination (58 transcript pages) greatly exceeded his direct examination (38 pages). The hearing officer allowed McNally the option to finish cross-examining Kyger by telephone. The hearing officer even advised McNally's counsel to do that before calling McNally as the last witness. Yet McNally's counsel declined, knowing that Kyger would be unavailable later. And in objecting to Kyger's release, McNally did not claim that he was obstructed from impeaching Kyger or presenting any critical information. McNally's only objection was that he "could have saved a lot of time with other witnesses" had he first finished with Kyger. This is not the stuff of a constitutional violation.

### 3. The hearing officer did not invent critical facts (Assignment of Error 5).

McNally next claims that the hearing officer violated McNally's procedural-due-process rights by inventing critical facts on which he based the ruling. In particular, McNally objects that the hearing officer characterized the medication McNally took on March 4 as a "sedative." McNally insists that the record did not support that finding.

- 27 -

We find this claim meritless on multiple levels. First, whether McNally's medicine was a "sedative" did not matter because that characterization did not undercut DMV's reasons for firing him. McNally told Agent Lamper that he "could feel the signs" from the medication and "knew" he "should not be driving the cruiser—but [McNally] did anyway." McNally also disregarded Agent Kyger's instruction not to drive the cruiser after taking the medication. Whether the medicine was a "sedative" did not affect DMV's reasons for terminating McNally's employment.

Second, McNally is wrong in claiming that "nowhere in the record is this medicine ever called a 'sedative.'" Agent Kyger testified that McNally repeatedly said he took a "sedative" before undergoing an MRI, though Kyger did not know which one.

Third, McNally's description of the drug he took fits the common understanding of "sedative"—"a drug that allays irritability, nervousness, or excitement." *Sedative*, *Webster's Third New International Dictionary Unabridged* (2002). McNally testified that since he first experienced claustrophobia during a 2008 MRI, he had taken Ativan before all other MRIs. The medication used to fill that prescription was Lorazepam, a generic version of Ativan. The warning label advised, "Call your doctor or get medical help if any of these side effects bother you or do not go away: Feeling dizzy, sleepy, tired, or weak." When McNally's lawyer asked him if he knew that Ativan was a "sedative," McNally answered, "I don't know what it is. It's to reduce anxiety." So regardless of whether McNally recognized the drug he took as a "sedative," he described its properties as consistent with those of a sedative to calm his nerves before the MRI.[12]

---

[12] McNally claims that the hearing officer invented two other facts, but those claims too are exaggerated. McNally complains that "because Larry Custer did not testify," the hearing officer could not have found that McNally was at the Ruritan Club when he told the fire marshal he was home. But as shown above, Custer's statements were properly considered, and the

### 4. McNally fails to show unconstitutional bias by the hearing officer (Assignment of Error 2).

We have said that "having 'an impartial decision-maker' is one of the 'minimum requirements of constitutional due process' for 'administrative hearings.'" *KSS One*, 76 Va. App. at 784 (quoting *Hladys v. Commonwealth*, 235 Va. 145, 147 (1988)). The current recusal rules under the State Grievance Procedure satisfy that requirement. DHRM requires a hearing officer to recuse "in any hearing 'in which the [hearing officer's] impartiality might reasonably be questioned.'" DHRM, *Rules for Conducting Grievance Hearings* III(G), at 8 (July 2020), https://perma.cc/9VY7-3Q6S. "Grounds for recusal include . . . a personal bias or prejudice concerning a party or a party's advocate." *Id.*; *see also Hearing Officer Deskbook*, *supra*, V(H), at 14-15 ("Disqualification"). DHRM's guidance makes clear, however, that a "hearing officer also 'has a concomitant obligation not to recuse himself or herself absent a valid reason for recusal.'" *Rules for Conducting Grievance Hearings*, *supra*, at 9 (quoting EDR Ruling No. 2004-934).

McNally argues that the hearing officer here was so biased against him and had so prejudged the case that McNally was denied due process. Having reviewed this claim de novo, we find it to be baseless.[13]

---

evidence supported the hearing officer's finding that McNally was at the Ruritan Club when he told the 911 dispatcher and the fire marshal that he was watching the fire from his house. McNally also claims that the lack of corroborating phone records means there was no evidence to prove that Agent Kyger told McNally by phone not to drive after being medicated for the MRI. But the hearing officer acted well within his discretion to believe Agent Kyger when he testified that he spoke to McNally on Lamper's phone, a claim that Lamper also corroborated.

[13] McNally's claim of unconstitutional bias is based on the same argument raised in his DHRM appeal that the hearing officer's bias violated DHRM policy. As noted above, we cannot review DHRM's decision that the hearing officer properly followed State policy. We review only whether the hearing officer violated McNally's procedural-due-process rights by failing to recuse.

"[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level." *Caperton v. A.T. Massey Coal, Co.*, 556 U.S. 868, 876 (2009) (quoting *FTC v. Cement Inst.*, 333 U.S. 683, 702 (1948)).  But "there are objective standards that require recusal when 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'"  *Id.* at 872 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).

First, the Due Process Clause requires "that a judge must recuse himself when he has 'a direct, personal, substantial, pecuniary interest' in a case."  *Id.* (quoting *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)).  Second, recusal is required when the judge has "a financial interest in the outcome of a case."  *Id.* at 877.  And third, due process requires recusal if the judge participated in an earlier phase of the proceeding, such that, it would be "difficult if not impossible for a judge to free himself from the influence of what took place" before.  *Id.* at 880 (quoting *In re Murchison*, 349 U.S. 133, 138 (1955)).

McNally has shown nothing like that here.  He does not claim that the hearing officer had any personal or pecuniary interest in the outcome of the proceedings.  Nor does McNally identify even a single remark by the hearing officer suggesting impermissible bias.[14]  Instead, McNally sees bias in the fact that the hearing officer ruled against him several times and characterized McNally's conduct unfavorably in his written opinion.  McNally complains, for instance, that the hearing officer found DMV's witnesses to be "both credible and consistent on the material issues," and their "demeanor" to be "candid and forthright," without saying anything about the credibility or demeanor of McNally or his witnesses.  McNally infers that the hearing officer

---

[14] Even as to judges, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  *Liteky v. United States*, 510 U.S. 540, 555 (1994).  Such remarks "*may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  *Id.*

must have been "predisposed to find against him." "But if this were the criterion of prejudice, no rulings could ever be made which a party opposes." *Va. Bd. of Med. v. Hagmann*, 67 Va. App. 488, 516 (2017) (quoting *Stamper v. Commonwealth*, 228 Va. 707, 714 (1985), *superseded on other grounds as stated in Shaw v. Commonwealth*, 79 Va. App. 485 (2024)).

Reviewing "courts 'apply a presumption that public officials have acted correctly.'" *KSS One*, 76 Va. App. at 784 (quoting *Hladys*, 235 Va. at 148). "'Without a showing to the contrary, state administrators "are assumed to be [persons] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances."'" *Id.* (alteration in original) (quoting *Hladys*, 235 Va. at 148). McNally has not come close to overcoming that presumption. Having reviewed the transcript and the audio recording of the grievance hearing, we find the hearing officer's handling of the proceeding to be exemplary. McNally's examples of bias reflect nothing more than disappointment that the hearing officer viewed the evidence and resolved the evidentiary conflicts in DMV's favor.

CONCLUSION

McNally has couched his complaints about the hearing officer's conduct of the grievance hearing in the language of procedural due process. But McNally has failed to show how the hearing officer violated constitutionally protected guarantees essential to a fair hearing. Once the procedural-due-process label is removed, McNally's challenges are nothing more than nitpickings about run-of-the-mill procedural rulings and factual findings by a hearing officer that are not subject to judicial review under the State Grievance Procedure.

*Affirmed.*